Ron Kilgard, AZ Bar No. 005902
KELLER ROHRBACK, P.L.C.
3101 North Central Avenue, Suite 1400
Phoenix, Arizona 85012-2643
Phone :  602-230-6324
Fax    :  602-248-2822
Rkilgard@KellerRohrback.com
Attorneys for Plaintiff

*Additional Attorneys on Signature Page*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| CHARLOTTE WOOD, on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br>   v.<br><br>IMH SECURED LOAN FUND, LLC; IMH FINANCIAL CORPORATION; INVESTORS MORTGAGE HOLDINGS INC.; IMH HOLDINGS, LLC; IMH MANAGEMENT SERVICES, LLC; SHANE ALBERS; WILLIAM MERIS; STEVEN DARAK,<br><br>        Defendants. | No. _____<br><br>**COMPLAINT**<br><br>1. **Breach of Fiduciary Duty**<br>2. **Aiding and Abetting Breach of Fiduciary Duty** |

## CLASS ACTION COMPLAINT

### Nature of the Action

Plaintiff, Charlotte Wood ("Plaintiff"), by her undersigned counsel, alleges the following as and for her complaint, upon information and belief, except for those allegations which pertain to her, which are alleged on knowledge:

1

1.     This is a class action brought on behalf of all unitholders ("Unitholders") of IMH Secured Loan Fund, LLC (the "Fund") who will be:   (1)   damaged by the conversion transaction (the "Conversion" or the "Transaction") proposed by the Fund's manager, Investors Mortgage Holdings, Inc. (the "Manager"), its affiliates, including IMH Holdings, LLC ("Holdings"), and the individual defendants Shane Albers ("Albers"), William Meris ("Meris") and Steven Darak ("Darak", together with Albers and Meris, the "Individual Defendants", and together with the Manager and Holdings, the "IMH Defendants") and (2) coerced or misled into voting for the Conversion Transaction pursuant to a coercive and misleading Form S-4 Registration Statement filed with the United States Securities and Exchange Commission on May 10, 2010 (the "Registration Statement"), and declared effective on May 14, 2010.

2.     On February 11, 2010, the Manager, Holdings and the Individual Defendants, entered into the Agreement and Plan of Conversion and Contribution, by and among IMH Secured Loan Fund, LLC, IMH Financial Corporation, Investors Mortgage Holdings, Inc., and its Stockholders, IMH Holdings, LLC and its Members (the "Conversion Agreement"), which contemplates a multistep transaction resulting in the internalization of the Manager and its affiliates and the conversion of the Fund into a publicly traded holding company, to be called IMH Financial Corporation ("IMH" or the "Company").   (This was subsequently replaced by a May 5, 2010, Conversion Plan Agreement).

3.     Pursuant the Conversion Agreement, the Fund is to be converted into a Delaware corporation, with Unitholders receiving 220.3419 of either non-transferable

shares of IMH Class B or IMH Class C shares, or a combination thereof, for each unit. The Conversion Agreement contemplates that the Class B shares will eventually be converted to IMH shares, albeit subject to lengthy transfer restrictions, which are to be listed on the New York Stock Exchange ("NYSE"), while the Class C shares are to be redeemed at the Manager's discretion, with proceeds of a public offering, assuming that IMH can go public.

4.     The terms of the Conversion Transaction were not negotiated by way of an arm's length process, but rather were devised by Albers and Meris, among others, to benefit and entrench themselves.

5.     For instance, under the Conversion Agreement: (1) IMH is required to purchase the equity of the Manager and Holdings, which are wholly owned by the Albers and Meris, for approximately $18 million in IMH stock (depending upon the Manager's and Holding's net losses as per the Conversion Plan), despite the fact that they have no income and will sustain a significant loss in the first quarter of 2010; (2) the stock to be received by Albers and Meris can be sold, under certain circumstances, almost immediately upon the an IMH listing on the NYSE, and potentially ahead of the stock to be received by Unitholders, as further discussed below; (3) the Manager's over $7 million in current expenses, and its future expenses, will be borne by IMH (4)while Albers and Meris become executives and directors of the IMH, and receive lucrative, although yet to be negotiated, employment agreements, stock incentives and other remuneration; (5) Albers and Meris and other executives of the Manager and Holdings will also own over 10% of IMH, although they have very few units to be converted to IMH shares; and (6)

Albers and Meris will also receive six-year indemnification agreements, a crucial factor given their admitted mismanagement of the Fund.

6.     In contrast, the Unitholders will be damaged as: (1) it is in the discretion of the Manager, as to when and if IMH will be publicly listed; (2) even if it is listed, the Class B shares received by Unitholders which will be convertible to restricted IMH shares, will be subject to a lock up and not transferable for a period anywhere from six months to a year; (3) the Class C shares will be redeemed at the Manager's discretion at a price to be determined by the Manager, with some portion of the proceeds of a subsequent public offering, but at a price less guaranteed to be less than the Unitholders' initial investment; (4) the Unitholders will be forced to take a reduction in their tax basis, and, thus, will lose any tax benefits which have accrued to them as a consequence of the Fund's losses; and (5) they will also lose the right to be cashed out as provided for in that section of the Operating Agreement which refers to roll-up transactions.

7.     The Registration Statement, pursuant to which a vote for the Conversion Transaction is being solicited, is false and misleading and coercive.

8.      According to the Registration Statement, the ostensible purpose of the Transaction is to enable IMH to raise funds so that it can create liquidity for the Fund's current Unitholders, cause the Fund to be internally managed, and raise additional funds in the public market so that IMH can take advantage of real estate related investment opportunities which the market currently presents.

9.     However, there is no guarantee that IMH will able to list, much less go public, and, in fact, the Manager has complete discretion as to whether to take IMH

4

public, leaving the Unitholders with even less liquidity than they now have. Moreover, given the Manager's and Holding's track record of mismanagement, as further discussed below, there is a great likelihood that such a public offering would not occur—or occur at prices which would yield Unitholders consideration significantly below the cost of their investment.

10. Moreover, there is no reason for IMH to purchase the Manager and Holdings. The revenues for both entities are based upon the Fund being able to originate hard asset loans, modify these loans, and recover on defaulted loans. The Fund, however, only has five loans which are not in default, and has not originated any loans since 2008. Both the Manager and Holdings are effectively insolvent, and, therefore, there is no logical or business reason for the Unitholders to effectively pay almost $18 million in IMH stock to purchase them.

11. The Conversion will clearly not provide Unitholders with liquidity any time in the near future, if at all. Rather, the true, and undisclosed purpose for the Transaction is so that the Manager, its subsidiaries and related entities, and the Individual Defendants, can monetize their management rights which they maintain under the IMH Loan Fund, LLC Restated Limited Liability Company Operating Agreement (the "Operating Agreement"), receive employment agreements and concomitant remuneration, off load the Manager's liabilities onto IMH, obtain six year indemnification agreements (which they do not presently have), and have the opportunity to dump almost 10% of IMH stock ahead of the Unitholders.

12.     The Transaction will further eliminate the standing of the Unitholders to bring mismanagement claims against the Manager and Holdings which they now have as a consequence of the Manager's admitted failure to perform appropriate due diligence on the Fund's current real estate portfolio, and maintain proper internal accounting controls. This mismanagement has, among other things, caused the Fund's auditor to question whether the Fund can continue as a going concern.

13.     Furthermore, under Section 2.40 of the Operating Agreement, the Conversion constitutes a roll up transaction, in that the Transaction involves a conversion of the Fund, along with other entities, and the issuance of securities or units of a new company.  The Conversion, however, does not provide dissenting Unitholders with a cash out option as is required under a "roll up", as set forth in Section 13.2.2 of the Operating Agreement.  Operating Agreement at Section 13.2.2.

14.     In various of the Fund's public filings, the Manager has admitted that it and its directors, Albers and Meris, are fiduciaries to the Fund and its Unitholders, and that in a conflict of interest situation, they are required to "exercise their fiduciary duties . . . in a manner that they believe will preserve and protect" [Unitholders'] rights.  Form 10 filed with the SEC on April 30, 2007 (the "Form 10") at p. 39-40.  The fiduciary duties are "both contractual and imposed by Delaware common law."  *Id.* at 40.

15.     These fiduciary obligations are further elaborated in Section 3.4 of the Operating Agreement, which states that, "[t]he Manager has fiduciary responsibility for the safekeeping and use of all funds and assets of the Company, whether or not in the Manager's possession of control, and the Manager will not employ, or permit another to

employ the Company's funds or assets in any manner except for the exclusive benefit of the Company." Operating Agreement at p. 16.

16.    The Manager, its wholly owned subsidiary, Holdings, and the Individual Defendants are fiduciaries on both sides of the Transaction, and thus owe to the Fund and the Unitholders, the duty of entire fairness; that is, to propose a Transaction which is the product of a fair process and results in a fair price.  They further owe a duty of loyalty.

17.    The Defendants have breached and, unless enjoined, will continue to breach their fiduciary duties both to the Unitholders and the Fund.

18.    The Transaction is neither fair from a process nor substantive point of view, and is a violation of the Manager's, Holding's, and Individual Defendants' fiduciary obligations both under common law and the Operating Agreement.

19.    The Transaction is procedurally unfair as:

    a. despite the Manager's conflict of interest, no independent entity or person, whether an attorney or investment advisor, represented the Unitholders' interests in negotiating the terms of the Transaction or in even determining whether the Transaction is an appropriate strategy for the Unitholders;

    b. as such, no one has opined whether the Transaction, including the merger ratio of 220.3419 of Class B or Class C shares for every unit (the "Merger Ratio"), the transfer restrictions or lock up provisions, and the change in the tax basis of their Units to which Unitholders shares will be subject are fair to the Unitholders;

c.  no one has considered the value of the Unitholders' or the Fund's claims against the Manager and Holdings, and the fact that once the Conversion occurs, neither the Unitholders nor the Fund will have standing to bring those worthwhile claims, much less valued those claims in determining the Conversion Ratio;

d.  the Conversion Ratio is based upon the Manager's determination of the net asset value of the Fund, which is not reliable, since as the Manager has admitted, the Fund lacks sufficient internal controls to produce accurate financial information;

e.  the Manager terminated its first investment advisor which was retained to opine upon whether the price being paid for the Manager's and Holding's equity was fair from a financial point of view to the IMH shareholders (who do not yet exist), and, when dissatisfied with its determination,  retained another financial advisor which did not opine on the fairness of the Transaction to the Unitholders; and

f.  the consideration being offered to the Unitholders is far less than their original investment.

20.  The price of Conversion Ratio is unfair as:

a.  There has been no consideration of the value of the Fund's or the Unitholders' mismanagement claims against the Manager and Holdings, nor any consideration of the reduction in their tax basis of their units;

b. There is no guarantee that IMH will be able to list on the NYSE, much less that it will ever hold a public offering, as that decision is left to the discretion of IMH's board of directors on which the Individual Defendants will sit and, therefore, the Unitholders potentially could end up with no consideration for their units and no liquidity;

c. If a Unitholder opts for receipt of Class C stock, it has no idea how much consideration it will receive, since Class C stock, according to the Registration Statement, will be redeemed on terms determined at the discretion of the Manager, presumably to be paid out of proceeds of a public offering, but in any event will be less than the cost of a Unitholder's original investment;

d. Even if IMH is able to list, there is no indication as to how much the Class B shares will be worth, as those shares can only be converted to IMH shares, and sold subject to lengthy lock up provisions. Thus, they may not be worth anything (much less fair consideration) to the Unitholders; and

e. The Conversion Ratio was determined based upon unreliable financial information.

21. The price of approximately $18 million (less net losses as per the Conversion Plan) in IMH shares being paid for the Manager and Holdings is unfair as they are presently insolvent.

22.    The Registration Statement proxy is coercive, misleading and constitutes a breach of the Manager's, Holding's, and Individual Defendants' fiduciary duties of candor and fair dealing to the Unitholders as:

a.    It threatens the Unitholders that if the Conversion Transaction and a new method for determining its fees (based upon an upfront payment rather than based upon the assets of the Fund) are not approved, the Manager may resign;

b.    it does not contain   an opinion indicating that the terms of the Transaction are fair to the  Unitholders or the Fund;

c.    it contains a substitute opinion by Sutter Securities Incorporated ("Sutter") that the consideration to be received by the Manager and Holdings is fair to IMH shareholders, an irrelevant constituency as IMH does not even now exist;

d.    it does not provide any potential value of IMH shares should the Company list, nor does it provide any time line in which the Company is intended to be taken public;

e.    it misleadingly states that the purpose of the Conversion is to provide Unitholders with liquidity, imposes onerous transfer restrictions on the Unitholders' sales and leaves in the discretion of IMH's board, on which Albers and Meris will sit, the option of taking the IMH public, and therefore, could potentially and is likely to leave the Unitholders in a completely illiquid situation;

f.  the fairness opinion provided by Sutter (the "Fairness Opinion"): (1) calculates the Manager's value, in significant part, based upon IMH going public rather than the Manager's current value as an insolvent entity;  (2) uses a comparables company analysis that does not reflect current market conditions, nor mismanagement by the outside manager who is being internalized, as is the case here; (3) fails to take into account the fact that the Manager's two primary sources of income were the origination of loans, which have ceased, and a management fee based upon the value of the Fund's portfolio, which has declined, thus giving the Manager no income, making it insolvent and not worth $18 million; and (4) does not opine that the Transaction or even the consideration to be paid to the Manager and Holdings is fair to the current Unitholders; and

g.  the Fund does not have recent financial for the first quarter 2010 available, so that the financial information in the Registration Statement is stale.

23.  The Transaction is further a breach of provision 3.5 of the Operating Agreement, and is being effectuated solely so that the Manager, Holdings and the Individual Defendants can guarantee themselves an income stream, other benefits, job security, and use the Fund's assets as a basis for raising public funds, in order to engage in transactions which will increase their remuneration.

24.     In response to the Conversion Transaction, in late May 2010, a group consisting of both Unitholders and real estate professionals was formed for the purpose of defeating the vote on the Conversion Transaction and replacing the Manager.

25.     The group, called "The Committee to Protect IMH Secured Loan Fund" (the "Committee") has disseminated a Consent Solicitation and other public statements in an attempt to defeat the Conversion Transaction, and replace the Manager.

26.     In response to the Committee's statements, the IMH Defendants have disseminated a number of additional false and misleading statements, effectively amending the Registration Statement, as further discussed below.

27.     Moreover, in an attempt to entrench themselves, and defeat any legitimate opposition to the Conversion Transaction, on about May 17, 2010, certain of the Defendants, purportedly on behalf of the Fund, commenced an action entitled, *IMH Secured Loan Fund, LLC v. David I. Kurtz, and individual, on behalf of himself, and all other persons similarly situated,* Case No. 2:10-01071-ROS, in the United States District Court for the District of Arizona (the "*Kurtz Action*").

28.     By way of the *Kurtz Action*, which was clearly brought to stifle any opposition to the Conversion Transaction by way of its *in terrorem* effect, Defendants seek a declaratory judgment stating that the Registration Statement is not false and misleading, and that the Conversion Transaction does not constitute a breach of the Defendants' fiduciary duties.

29.    The *Kurtz Action* itself is a misuse of the corporate machinery of the Fund, and an inappropriate derivative action which the Individual Defendants are abusing in order to entrench themselves.

30.    Plaintiff thus brings this action to:  (1) enjoin the Conversion Transaction; (2) enjoin any Unitholder vote pursuant to the misleading Registration Statement and additional statements made by the IMH Defendants; (3) ensure dissemination of a full and fair Registration Statement; (5) cause the Manager to retain independent advisors on behalf of the Unitholders; and  (6) remove the current Manager.

31.    No vote regarding the Transaction can be consummated until the *Kurtz Action* is completed.

## JURISDICTION AND VENUE

32.    The Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332, diversity jurisdiction, as Plaintiff is a resident of California, Defendants are residents of Arizona, and the amount in controversy exceeds $75,000.

33.    Venue is proper is this judicial district under 20 U.S.C. Section 1391 as this is the place where the Defendants reside and the place where the cause of action arose.

## PARTIES

34.    Plaintiff, Charlotte Wood, is a holder of units of the Fund, and has been a holder at all relevant times hereto.  She is a resident of California.

35.    Defendant IMF Secured Loan Fund, LLC, is a limited liability company that maintains its principal place of business is in Scottsdale, Arizona, and is incorporated in Delaware. It is principally governed by the Operating Agreement.

13

36.     The Fund was commenced and started operating in 2003 for the exclusive purpose of originating, acquiring, and managing commercial real estate loan investments consisting primarily of short-term commercial mortgage loans in the $10 million to $15 million range, collateralized by first mortgages on real property.  Most of the loans had short maturities of between six to 24 months, and were supposed to be made to creditworthy borrowers, as determined by the Manager. The Fund invested in mortgage loans principally in the southwest, particularly Arizona and California.

37.     Units of the Fund were sold commencing in about 2003 to accredited investors with an original minimum investment of $50,000 per unit, unless the Manager allowed a smaller investment.  The Manager soon had a network of broker-dealers throughout the United States selling units to persons who were not accredited in a continuous offering.

38.     Defendant Investors Mortgage Holdings, Inc., or the Manager, is an Arizona corporation, with a principal place of business in Scottsdale, Arizona.  It is 90% owned by Individual Defendants Albers and Meris, who serve as the Manager's chief executive officer and president, respectively.  Defendant Darak is the Manager's chief financial officer.  Other than a board of directors and executive officers, the Manager has no other employees.

39.     It is the outside manager of the Fund and has responsibility over almost all matters affecting the Fund and its operations.  As stated in the Operating Agreement at Section 3.1, "the Manager has exclusive control over the business of the Company [Fund]".

40.    More specifically, the Manager has responsibility for the Fund's underwriting, managing its investments, entering into agreements with lenders, originating mortgages, managing its mortgage investments, accounting, tax and legal matters, communicating with regulatory agencies, performing internal reviews of the Fund's investments and loans, and determining how and when to investment the Fund's capital, among other things.  Operating Agreement at Sections 3.1-3.3.3.

41.    Under Section 3.4 of the Operating Agreement, "[t]he Manager has fiduciary responsibility for the safekeeping and use of all funds and assets of the Company [Fund], whether or not in the Manager's possession or control, and the Manager will not employ, or permit another to employ the Company's [Fund's] funds or assets in any manner except for the exclusive benefit of the Company [Fund]."

42.    The Manager cannot, however, impair the ability of the fund to carry on its business, admit another manager, or sell all or a substantial portion of the Fund's assets, without a vote of the majority in interest.

43.    Moreover, the Manager's right to indemnification from the Fund is allowed only under the very limited circumstance, in which all of the following conditions are satisfied: (1) the Manager has determined in good faith, that the course of conduct leading to the loss or liability was in the best interests of the Fund; (2) the Manager was acting on behalf of the Fund; (3) the liability was not the result of negligence of misconduct by the Manager; and (4) the indemnification will be paid from Fund assets. Operating Agreement at Section 3.5.1.

44.     The Fund pays the Manager an annual management fee of 0.25% of the Earnings Assets Base or the mortgages held by the Fund and property acquired through foreclosure upon which income is being accrued, and 25% of the late fees, penalties, or any net proceeds from the sale of a foreclosed asset after payment to the Fund of its principal and interest due in connection with the loan associated with the foreclosed property.  Operating Agreement at Sections 2.14 and Article 14.

45.     According to the Registration Statement, the Manager is also entitled to receive 100% of all origination fees and points associated with new mortgages, and the modification of existing mortgages, although the Operating Agreement makes no mention of loan origination as a source of income for the Manager.

46.     Thus, the only means for the Manager to earn fees from the Fund is if the Fund is originating mortgages, increasing its asset base, and collecting on those mortgages which it has already extended.

47.     Defendant IMH Holdings, LLC is an entity affiliated with and wholly owned by the Manager and is a holding company for two entities which are also affiliated with the Manager, Defendant IMH Management Services, LLC, and SWI Management, LLC.  It has its principal place of business in Scottsdale, Arizona.

48.     Defendant IMH Management Services, LLC ("IMH Services"), is an Arizona limited liability company with its principal place of business in Scottsdale, Arizona.  IMH Services provides the Fund and affiliates of the Manager with human resources and administrative services, employees, and was established in 2007.

49.     Defendant Shane Albers is the chief executive officer of the Manager, one of its two directors (Meris being the other director) and one of its principal stockholders. Albers intends to be one of the directors of IMH after the Transaction.

50.     Albers was the person primarily responsible for the strategic positioning and vision of the Fund, was the "chairman" of its purported loan committee, and the primary author of its underwriting standards and loan administrative policy.

51.     The Manager has no compensation policy, and thus Albers and Meris determine their own compensation, which is equal to a salary and cash bonus.  In 2008, for instance, Albers earned a base salary of $550,000 in his position with the Manager.

52.     After the Conversion, Albers' remuneration will significantly increase, as he will receive a significant portion of the $18 million in stock for the sale of the Manager, will receive a base salary, and will participate in a long term incentive stock program.

53.     He will also receive 396,517 shares of IMH after the Conversion, giving him 2.3% of the Company from that transaction alone.

54.     Defendant William Meris is the other director of the Manager and its president, and is the person responsible for the Fund's day to day operations.

55.     He was paid a base salary by the Manager in 2008 of $420,000 and was eligible to receive a cash bonus.

56.     As a consequence of the Conversion, he will become a director of IMH, and be eligible to receive significant remuneration including an employment package, and long term stock incentives.

17

57.     He will also receive a significant portion of the $18 million in IMH stock which IMH will pay to purchase the Manager, as well as an additional 394,045 shares for his 14,63 units of the Fund—the later alone providing him with 2.3% of IMH's outstanding stock.  With IMH's purchase of the Manager for approximately $17.9 million (less net losses) in IMH stock, or 5.3% of the outstanding stock, he and Albers will ultimately own approximately 10% of the outstanding shares of IMH (some of the stock will go to other executives of the Manager), and will constitute its largest voting block of shares.

58.     Defendant Steven Darak is the Manager's chief financial officer and principal accounting officer.  As such, Darak was responsible for the Fund's financial reporting and securities law compliance.  In 2008, he received a base salary of $240,000.

59.     As a consequence of the Conversion, he will receive over 50,000 shares of IMH although he owns no units to be converted.

60.     Defendant IMH Financial Corporation is a Delaware corporation through which the Transaction will be effected, and is named herein for purposes of injunctive relief.

## CLASS ACTION ALLEGATIONS

61.     Plaintiff brings this action on her own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the class defined in paragraph 1 hereof (the "Class").

62.     This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. There are over 4,700 geographically disbursed Unitholders of the Fund, although the actual number can be ascertained through discovery.

b. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member, including:   Whether the Defendants have breached their fiduciary duties, including the duties of loyalty, candor and entire fairness; whether the Defendants are engaging in self-dealing, whether the Defendants are violating their obligations under the Operating Agreement, whether the Unitholders will be damaged as a consequence of these violations and breaches, and whether such damage is irreparable.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

d. Plaintiff's claims are typical of the claims of other members of the Class and Plaintiff does not have any interests that are adverse to the Class.

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

      f.   Defendants have acted or failed to act on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

63.    Plaintiff anticipates that here will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### The Fund

64.    The Fund was sold through a network of brokers related to Albers throughout the United States, in a continuous public offering.

65.    It is primarily governed by the Operating Agreement, which was initially entered into in 2003, and amended in 2006.  Under Section 1.3 of the Operating Agreement, the purpose of the Fund is to generate earnings and cash flow to distribute to the Unitholders by purchasing mortgage investments.

66.    It is a hard money real estate finance company, which lends money on real estate projects more quickly than traditional banks, collateralizing these loans by a first mortgage on the property subject to the loan, and personal guarantees.

67.    The key to such "hard money" lenders, as they are known, is the proper assessment of the underlying collateral.  Once a borrower defaults, the hard money lender quickly forecloses on the property and resells those assets.

68.     In the instance of the Fund, the Manager further extended loans on real estate properties based upon the personal guarantees of individuals associated with those properties.

69.     Under those circumstances, it should have been almost impossible for the Fund to lose money. The Defendants lent money on hard assets at a 60% loan to value ratio with personal guarantees for the remainder of the loan.  Had it done appropriate due diligence and adhered to proper underwriting standards, even if the borrower defaulted, the Fund should have been able to recover the value of the loan from the value of the hard asset and/or appropriately documented personal guarantees from creditworthy individuals.

70.     Even with a dramatic decline in the real estate market, had the Manager done appropriate due diligence, the Fund was structured so that it should not have lost significant value.

### **The Manager**

71.     The Manager is owned and controlled by Individual Defendants Albers and Meris.

72.     Under Section 3.1 of the Operating Agreement, the Manager, and therefore Albers and Meris, have exclusive control over the business of the Fund, including the power to determine how the Fund would invest its assets, make mortgage investments and all the duties attendant to that responsibility, deal with Unitholders, take responsibility for all accounting, tax and legal matters, perform internal reviews of the

Fund's investments and loans, determine how and when to invest the Fund's capital and determine the course of action to take when the Fund's loans are in default.

73.     Under Section 3.1.6, the Manager also has the right to employ others as necessary to operate the Fund, such as Holdings, and has the obligation to retain all adequate records of the Fund.

74.     However, under Section 3.2.2, the Manager cannot, in significant part:  (1) do any act which would make it impossible to carry out the ordinary business of the Fund; (2) sell all or substantially all of the assets of the Fund without a vote and consent of a majority; (3) amend the operating agreement without a vote of the majority of Unitholders; and (4) cause the merger or other reorganization of the Fund without the prior consent of the majority of Unitholders.

75.     Under Section 3.4, "the Manager has a fiduciary responsibility for the safekeeping and use of all funds and assets of the [Fund], whether or not in the Manager's possession of control, and the Manager will not employ, or permit another to employ the [Fund's] funds or assets in any manner except for the exclusive benefit of the [Fund]."

76.     That provision further states that, the Fund shall not allow any Unitholder "to contract away the fiduciary duty owned to any [Unitholder] by the Manager under common law", thus admitting that the Manager maintains common law fiduciary duties to Unitholders.

77.     The Manager is not entitled to indemnification for any loss which it may suffer as a consequence of negligence or other wrongdoing under Section 3.5.1., or

violations of federal or state securities laws as a consequence of misconduct or successful adjudication on the merits or a dismissal with prejudice, exonerating the Manager.

### The Fund's Performance Declines

78.     The Fund's motto, which Albers continually repeated in his letters to Unitholders, was: "Rule 1:  Don't lose the money. Rule 2: Don't lose the money.  Rule 3: Don't forget Rules 1 and 2."  October 6, 2008 Letter to Members of the IMH Secured Loan Fund, LLC (the "October 6, 2008 Letter").

79.     However, the Manager, Holdings and the Individual Defendants did lose the Fund's money.  By the end of 2008, the Fund was experiencing significant claims for redemption as well as defaults on its loans, foreclosures, and, by April 2009, a write off of almost half the value of its properties.

80.     In an effort to stop the bleeding, by October 2008, the Manager ceased accepting new member capital, forbid new redemption requests, cancelled any existing redemption requests, and stopped originating any new loans – the Fund's primary source of income.

81.     Although the market events of mid to late 2008 contributed to the Fund's losses, as the Manager and Individual Defendants effectively admit in the Company's Form 10-K for the period ended December 31, 2009 (the "2009 10-K), the losses were exacerbated by the Manager's and Individual Defendants' mismanagement of the Fund in two areas: (1) their failure to perform appropriate due diligence; and (2) their inability to maintain internal controls.

82.     As the Manager admitted in the 2009 10-K, its "underwriting standards may not have protected [the Fund] from loan defaults" thus exposing the Fund to the risk that the "underwriting the Manager performed did not . . . reveal all material facts pertaining to the borrower and the collateral" leaving the Fund with "a greater risk of default by [the Fund's] borrowers."

83.     By taking personal guarantees from persons whose creditworthiness was questionable in order to support high risk loans, the Manager left the Fund open to suffer significant declines in portfolio value while simultaneously rendering it incapable of recovering on its loans if the real estate market were to collapse - which is precisely what occurred.

84.     As the Manager stated in the 2009 10-K, guarantors of our portfolio loans may not have had sufficient assets to support their guarantees, such that "if there is a default on a particular commercial mortgage loan and the guarantee, the only recourse may be to foreclose upon the mortgaged real property," which the Manager admitted that it did not have the experience to manage.  2009 10-K at 32.

85.     Further, the Fund admittedly lacked appropriate internal controls.

86.     As indicated in the 2008 Form 10-K, by late 2008, the Fund replaced its then current auditor with BDO Seidman ("BDO"), a nationally recognized accounting firm.

87.     As the further admitted in the 2008 10-K, by April 2009, the Fund was forced to take a major write down of its assets when it finally marked to market the value of its portfolio—sustaining a net loss of $258.3 million.

88.     The sudden write off at the end of 2008 resulting in a net loss of over $258 million was caused in significant part by the Manager's and the Individual Defendants' mismanagement.

89.     As the Manager explains in the 2009 10-K, of the Fund's 55 loans, 50 were in foreclosure, with a principal amount of $532 million in default. Again as the Manager admits in the Fund's Form 10-K for the period ended December 31, 2009 (the "Form 10-K") (which was not filed until April 15, 2010), under its watch, the Fund lacked sufficient internal controls, such that "[s]ubstantial work has been required, and may continue to be required, to implement, document, assess, test and remediate" the Fund's system of internal controls, leading to "material weakness in [the Fund's] internal control over financial reporting could . . . result in errors in [the Fund's] financial statements".

90.     If for instance, the Fund's performance is compared to that of the total delinquency of construction loans, the Fund experienced a far greater delinquency than the nationwide average.

91.     The Fund's losses were thus caused not only by the decline in the real estate market, but also the failure of the  Manager to perform due diligence and to keep appropriate internal records.

### The Manager's Compensation Declines

92.     With the freezing up of the credit markets, the roiling real estate market, and their own mismanagement, there was no longer a market for the Fund to originate loans, and thus no way for the Manager, Holdings and the Individual Defendant to earn significant fees.

93.     The compensation of the Manager is directly dependent upon the Fund's ability to originate loans, and on the value of the Fund's Earning Asset Base, or the mortgage investments held by the Fund, and the property which the Fund acquires by way of foreclosure, as determined under generally accepted accounting policies.

94.     More specifically, as set forth in the Operating Agreement at Article 14, the Manager earns an annual management fee of .25% of the Earnings Asset Base, 25% of late fees, penalties and any net proceeds from the sale of foreclosed assets after payment to the Fund of the principal and interest.

95.     For the nine months ended September 30, 2007, for instance, the Manager earned over $23 million in origination and processing fees, and $682,000 in annual fees.

96.     In the Form 10-K for the period ended December 31, 2008, the Manager admitted that it was close to insolvency.

97.     In order to offset this loss, in part, in 2008, the Manager attempted to create a second, competing fund, called Strategic Wealth and Management & Income Fund, LLC or the SWI Fund, for which IMH Services provided the personnel.

98.     When the Manager and the Individual Defendants were only able to raise amount of $10 million through this competing entity, they looked for another alternative, leading them to announce in late 2008, that they were considering a roll up of the Fund, among other strategic alternatives.

## The Manager and the Individual Defendants Decide on the Conversion

99.     According to the Registration Statement, at some point in mid-2009, the Manager and the Individual Defendants commenced discussions with a consultant, called

ITH Partners, for the purpose of considering alternatives to provide members of the Fund with liquidity, including a liquidation of the Fund, a sale of some of its assets, or a merger or an acquisition, among other things.

100.   The Manager dismissed the liquidation of substantially all of the Fund's assets and could not identify an acquisition or merger partner.  Notably, the Manager did not hire an independent investment advisor on behalf of the Unitholders to determine what the best course of action may have been for them.

101.   Consequently, in August 2009, several months into its consideration of alternatives, the Manager unilaterally determined that the best course of action would be to use the Fund's existing "platform" of the Fund and the Manager, and access the public equity market.

102.   During the third quarter of 2009, the Manager then consulted with its attorneys, including tax attorneys, and a professional advisor, to determine the structure of any transaction, and determined that the Conversion would be the best alternative. Once again, neither the Manager nor the Individual Defendants sought to hire an independent consultant or advisor to represent the Unitholders.

103.   In November 2009, the Manager hired an advisor called ValueScope to conduct a fair market value analysis of the Manager, resulting in two reports.

104.   ValueScope, based upon discussions with the Manager and the Individual Defendants, and the Manager's projections came up with such a wide range of values, however, that the Manager terminated it as an advisor and hired Sutter.

105.   Sutter, who did not act as an advisor to the Fund according to the Registration Statement, (which once again had no advisor), was hired only to render an opinion to the Manager's board of directors, for informational purposes, in order to help the board address the fairness of the acquisition of the Manager and Holdings from a financial point of view to the stockholders of IMH—although they did not yet exist.

106.   On December 29, 2009, before Sutter completed its analysis, the board of directors of the Manager met and reviewed a draft of the Registration Statement.  After questions and discussion, the board approved the filing of the Registration Statement, as did the board of Holdings—despite the fact that Sutter had not yet completed its analysis.

107.   On January 11, 2010, the Manager's board met again, with a representative of Sutter present, who reviewed the process which Sutter had used to perform its fairness analysis. After discussions with the Manager's and Holding's advisors, the Sutter representative indicated that after updating the opinion and making changes, Sutter was prepared to render its fairness opinion.

108.   On February 8, 2010, another meeting was held with the Manager's board, Sutter and the Manager's advisors.  At that meeting, a draft merger agreement was presented and Sutter provided an update to its fairness opinion, which it then provided to the Manager's board.  The board thereafter approved the Conversion and the 2010 Stock Incentive Award, although it had already authorized the filing of Registration Statement over a month earlier.

109.   At no time during these meetings and discussions was an independent advisor retained to negotiate on behalf of the Unitholders, with the Manager, the

Individual Defendants or Holdings, despite the fact that they are direct beneficiaries the Transaction.

110.    At no time was an opinion rendered with indicated that any part of the Transaction is fair from a financial view to the Fund's current Unitholders.

111.    In early May 2010, the IMH Defendants terminated the Merger Agreement and entered into the Conversion Plan, which provided, among other things, that the consideration to be paid to for the Manager and Holdings would be decreased by the net losses which they sustain before the conversion.

### The Fairness Opinion

112.    Moreover, the Sutter Fairness Opinion (the "Fairness Opinion") is fatally flawed.

113.    Given that Sutter was opining on the fairness of IMH's purchase of the Manager and Holdings, and not the fairness of the Transaction, in determining the Manager's and Holding's value, it took into account the impact of the proceeds from an initial public offering, and the Manager's and Holding's projected income under those circumstances for the period of 2010 to 2012.  It also considered that the Fund's assets would turn over within one to three years.

114.    It also took into account the Manager's income from SWI Fund which is to be rolled up along with the Fund.

115.    The Sutter analysis also did a comparables analysis, comparing the Transaction to other internalizations, including W.P. Carey & Co. LLC, and Wells Real

Estate Investment Trust—which took place several years ago and before the market events of 2008.

116.   Given those circumstances, Sutter opined that IMH's purchase of the Manager and Holdings for approximately $18 million in IMH stock was fair from the financial point of view to ***IMH shareholders.***

117.   Of course, Sutter did not opine - nor was it asked to opine - whether the purchase of the Manager and Holdings is fair to the current Unitholders, fair if IMH cannot go public, or fair if appropriate, comparable company transactions are considered. Moreover, the Fairness Opinion is based on a number of tenuous assumptions which all hinge on the Conversion and a subsequent initial public offering of IMH being completed.

118.   Had Sutter not made those assumptions and had it rendered a fairness opinion on the consideration being given to the Manager and Holdings based upon their current and foreseeable financial condition without the Conversion, Sutter could not opine that the purchase of the Manager and Holdings is fair to the Unitholders.

119.   On about May 5, 2010, Sutter updated its original February 5, 2010 opinion, but did not change its opinion despite the fact that the Manager has continued to suffer losses.

## The Transaction Is Procedurally Unfair

120.   In light of the above facts, the Transaction is procedurally unfair for the following reasons:

a. despite the Manager's conflict of interest, no independent entity or person, whether an attorney or investment advisor, represented the Unitholders' interests in the negotiation of the terms of the Transaction or in determining whether the Transaction is an appropriate strategy for the Unitholders;

b. as such, no one has opined whether the Transaction, including the Merger Ratio of 220.3419 of Class B or Class C shares for every unit, the transfer restrictions or lock up provisions, and the change in the tax basis of their units to which Unitholders shares will be subject, are fair to the Unitholders;

c. no one has opined as to whether the Transaction itself, through which Unitholders will receive non-trading shares of Class B or Class C stock, is fair to them;

d. no one has considered the value of the Unitholders' or the Fund's claims against the Management and Holdings, and the fact that once the conversion occurs, neither the Unitholders nor the Fund will have standing to bring those worthwhile claims, much less valued those claims in determining the Conversion Ratio;

e. the Conversion Ratio is based upon the Manager's determination of the net asset value of the Fund, which is not reliable, since as the Manager has admitted, the Fund lacks sufficient internal controls to produce accurate financial information;

f.   the Manager terminated its first investment advisor which was retained to opine upon whether the price being paid for the Manager's and Holding's equity was fair from a financial point of view to the IMH shareholders (who do not yet exist) and retained another financial advisor which would provide the Manager and Holdings with the opinion supporting the Fund's purchase of the Manager and Holdings, therefore making suspect any opinion which states that the consideration to the Manager and Holdings is fair to the Unitholders; and

g.   the consideration being offered to the Unitholders is far less than their original investment.

<u>**The Terms of the Conversion Are Substantively Unfair**</u>

121.   Pursuant the Conversion Agreement, the Fund is to be converted into a Delaware corporation, with Unitholders receiving 220.3419 of either non-transferable shares of IMH Class B or IMH Class C shares, or a combination thereof, for each unit.

122.   The Conversion Agreement contemplates that the Class B shares will eventually be converted to IMH shares, albeit subject to lengthy transfer restrictions of anywhere from six to twelve months, presumably to allow for an orderly distribution of IMH shares.

123.   The Conversion Ratio presumably is based upon the Fund's book value which is equal to $20 per share of IMH, providing each Unitholder with consideration worth approximately $4,406.98, considerably less than their original investment.

124.   Those Unitholder who opt for Class C shares fare even worse.  The Class C shares are to be redeemed at the Manager's discretion, with proceeds of a public offering, assuming that IMH can go public.

125.   Moreover, the Manager and Holdings intend to cause the Fund to make an election that will result in Unitholders having a lower tax basis in their Class B and C shares, so that IMH can retain a substantial tax basis in the Fund's assets.   As a consequence, many Unitholders will lose the tax loss which they currently possess.

126.   In the meantime, under the Conversion Agreement, IMH is required to purchase the equity of the Manager and Holdings, which are wholly owned by the Albers and Meris, for over $18 million in IMH stock, which can be sold under certain circumstances, almost immediately upon the an IMH being listed, thus making these entities wholly owned IMH subsidiaries, and allowing Albers and Meris to trade ahead of the Unitholders.

127.   As a consequence of this "internalization", the Manager's over $7 million in current expenses, and its future expense will be IMH's responsibility, while Albers and Meris become executives and directors of the IMH, and receive lucrative, although yet to be negotiated, employment agreements and other remuneration.

128.   As an additional consequence of the Conversion, the Individual Defendants and other executives of the Manager and Holdings will also own over 10% of IMH. They will also receive six-year indemnification agreements, a crucial factor given their admitted mismanagement of the Fund, and the fact that the current Operating Agreement does not allow for indemnification.

129.   Finally, the Transaction eliminates the Unitholders' rights under Section 13.2.2 of the Operating Agreement that provides that in the event of a roll up, the Unitholders can receive cash in an amount equal to the Unitholders' pro-rata share of the appraised net new asset value of the Fund.

130.   Section 2.40 of the Operating Agreement defines a "roll up" as a transaction involving the conversion of the Fund and the issuance of securities of the rolled up entity.

131.   Although the Registration Statement states that the Manager does not consider the Transaction a roll up, in fact, it falls precisely within that definition in the Operating Agreement.

132.   In light the lock up provisions, the lowering of the Unitholders' tax base, and the elimination of the Unitholders' right to receive cash, the Transaction is unfair from a substantive standpoint.

## The Registration Statement Is Misleading

133.   Finally, the Registration Statement, pursuant to which the Transaction is to be effected is misleading, coercive and a breach of the Defendants' duty of candor.

134.   The Registration Statement is misleading in the following respects:

a. it does not provide any potential value of IMH shares should the Fund be able to list, nor does it provide any time line in which the Company is intended to be listed or taken public;

b. it falsely states that the purpose of the Conversion is to provide Unitholders with liquidity, but leaves to the discretion of IMH's board,

on which the Albers and Meris will sit, the option of taking the IMH public, and therefore, could potentially and is likely to leave the Unitholders in a relatively illiquid situation;

c. the Fairness Opinion is: (1) it calculates the Manager's value, in significant part, based upon IMH going public rather than what the Manager's value is currently as an outside manager of the Fund; (2) uses a comparables company analysis that does not reflect current market conditions, nor mismanagement by the outside manager who is being internalized, as is the case here; and (3) fails to take into account the fact that the Manager's two primary sources of income were the origination of loans, which have ceased, and a management fee based upon the value of the Fund's portfolio, which has declined, thus giving the Manager no income, making it insolvent and thus not worth $18 million;

d.  does not opine that the Transaction or even the consideration to be paid to the Manager and Holdings is fair to the current Unitholders;

e. the Fund does not have recent financial for the first quarter 2010 available, so that the financial information in the Registration Statement is stale, and unreliable given the Fund's admitted absence of internal controls; and

    f.   It fails to disclose that the IMH Defendants have in fact commenced the *Kurtz Action*, in an effort to stifle any opposition to the Conversion Transaction and in an effort to continue to entrench themselves.

135.   Moreover, the Registration Statement is coercive in that the Individual Defendants, who are represented as key persons to the Fund and in the Conversion, threaten that if the Conversion Transaction is not approved; they may resign, and/or otherwise will seek approval of a new fee structure for themselves.

136.   This structure will be changed to an asset management fee of 1.5% to 2.0% of the cost basis of the Fund's total assets under management, and a carried interest fee of 20% of net earnings over a hurdle rate not yet determined.

137.   It also threatens Unitholders about the costs to the Fund if any Unitholder brings an action to try to stop or challenge the Conversion Transactions, in an attempt to discourage Unitholders from exercising their rights and challenging this unfair Transaction, and misleadingly discusses the possibility of indemnification by the Fund to the Individual Defendants.

<u>The Committee</u>

138.   In late May 2010, the Committee disseminated a number of filings, including a preliminary proxy (the "Preliminary Proxy") attempting to persuade Unitholders to: (1) either vote against the Conversion Transaction and/or rescind their consent for the Transaction if they had already voted; and (2) replace the Manager and elect the Committee as the new management of the Fund.

139.   In response to Committee's filings, including a Preliminary Consent Statement—Subject to Completion, dated May 28, 2010 (the "Preliminary Consent"), the IMH Defendants disseminated a number of investor letters, filed with the SEC pursuant to Rule 14a-6, effectively amending the Registration Statement.

140.   In these additional filings, and in particular a letter dated May 28, 2010 (the "May 28th Letter"), the IMH Defendants' continued their dissemination of false and misleading statements.

141.   In the May 28th Letter, the IMH Defendants make the following false claims:

(a) Denying that approximately 97% of the Fund's mortgages are in default, and claiming that the Committee's material too "strictly" defines "default";

(b) Denying that the Manager has earned over $93 million in fees, when in fact it has, and setting forth a number of analyses and charts seeking to obfuscate and confuse Unitholders, as to the amount of fees it has earned.  For example, the May 28th Letter contains a chart breaking down the amount of fees the Manager has earned as a percentage of the average amount invested by Unitholders, and postulates that the amount which the Manager has earned is less than what would have been earned in  a hypothetical front loaded fund;

(c)  Denying that the Fund lost $400 million, misleadingly stating that this is only a GAAP (generally accepted accounting principles) non-cash loss reserve—when in fact, it is apparently the loss which would be taken if the properties were sold today and thus is an unrealized loss;

(d) Stating that the Fund has established a very conservative loan to value ratio in its property loans but that it was the drop in the market that caused the Fund to suffer such significant losses, when, in fact, as the IMH Defendants admit in the 2009 Form 10-K, it was their failure to do proper due diligence, and to obtain necessary guarantees which caused a significant part of the loss;

(e) Stating that the Fund has assets which can be used for secured credit facilities, but not explaining why the entire Conversion Transaction is necessary if that is the case; and

(f) Indicating that the IMH Defendants have disposition plans for each of the 73 properties in the Fund's portfolios, which are not disclosed, and again undermine if not outright conflict with the need for the Conversion Transaction.

142.   The May 28th Letter only serves to confuse and obfuscate many of the statements made in the Registration Statement, and outright conflict with some of these statements.

The *Kurtz Action*

143.    On May 17, 2010, Albers and Meris authorized the filing of the *Kurtz Action*, purportedly on behalf of the Fund against a Unitholder, Kurtz, who disagrees with the Conversion Transaction.

144.    By way of the *Kurtz Action*, Albers and Meris name as a defendant class each Unitholder, stating, "[t]he approximate size of the Defendant Class is 4,735, and is comprised of individuals, corporations, partnerships, joint ventures or other legal entities who are Fund members."

145.    The ostensible purpose of suing each of the Unitholders, and Class member here it to obtain a declaratory judgment as to whether the Registration Statement is false and misleading, and whether in advancing the Conversion Transaction or "Reposition Plan", the Manager has acted consistently with its fiduciary duties.

146.    However, by filing the *Kurtz Action*, and placing these issues before the Court, the IMH Defendants have effectively admitted that they cannot close the vote on the Conversion Transaction by June 14th, the current date upon which they intend to close the vote, without a resolution of these issues.

## COUNT I

### Breach of Fiduciary Duty Against the IMH Defendants

147.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

148.    The Manager, Holdings and the Individual Defendants owe fiduciary duties to Unitholders and the Fund and are obligated to conduct the business of the Fund with loyalty, good faith and candor.

149.    The Manager, Holdings and the Individual Defendants breached their fiduciary duties, both to the Unitholders by negotiating and agreeing to the Transaction without regard to the adequacy and fairness of the  terms to Unitholders, and by engaging in a flawed process, which was tilted toward allowing an inadequate transaction with the Manager, Holdings and the Individual Defendants.

150.    If the Conversion is allowed to proceed, the Unitholders will be deprived of an adequate Transaction or alternative, including the option of receiving cash, and will be deprived of the opportunity to fully and meaningfully exercise their franchise.

151.    As a direct and proximate result of the Manager's, Holding's and the Individual Defendants' misconduct, both Unitholders and the Fund will suffer irreparable harm.

152.    Plaintiff has no adequate remedy at law.

## COUNT II

### Aiding and Abetting Against IMH and IMH Services

153.    Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

154.    As stated above the Manager, Holdings and the Individual Defendants breached their fiduciary duties to the Unitholders and the Fund.

155.   IMH and IMH Services, the remaining Defendants knowingly substantially assisted in this breach.

156.   IMH and IMH Services, the remaining Defendants, thus aided and abetted these breaches of fiduciary duty.

157.   As a direct and proximate cause of their having aided and abetted these breaches of fiduciary duty, Plaintiff will suffer irreparable harm.

158.   Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against Defendants, as follows:

A.      Declaring this action to be a class action and certifying the Plaintiff as the Class representative and her counsel, as class counsel;

B.      Enjoining, preliminarily and permanently, the Transaction;

C.      Enjoining any Unitholder vote pursuant to the misleading Registration Statement,

D.      Ensuring dissemination a full and fair Registration Statement/Proxy;

E.      Causing the Manager to retain independent advisors on behalf of the Unitholders,

F.      Removing the current Manager, and

G.      Granting such other and further relief as the Court deems appropriate.

Dated:  June __, 2010

*[Signature Block on Next Page]*

KELLER ROHRBACK, P.L.C.

By:     */s/ Ron Kilgard*
        Ron Kilgard

3101 North Central Avenue, Suite 1400
Phoenix, Arizona 85012-2643
Phone: 602-230-6324
Fax: 602-248-2822

The Grant Law Firm, PLLC
Lynda J. Grant
Seven East 35th Street, 12th Floor
New York, NY 10016
Phone: 917-697-8108
Fax: 917-256-1949
(Admission Pro Hac Vice Pending)

Lasky & Rifkind, Ltd.
Leigh Lasky
Norman Rifkind
350 N. LaSalle Street
Suite 1320
Chicago, IL  60610
Phone: 312-634-0057
Fax: 312-634-0059
(Admission Pro Hac Vice Pending)

Attorneys for Plaintiff