Ron Kilgard, AZ Bar No. 005902
KELLER ROHRBACK, P.L.C.
3101 North Central Avenue, Suite 1400
Phoenix, Arizona 85012-2643
Phone :  602-230-6324
Fax    :  602-248-2822
Rkilgard@KellerRohrback.com
Attorneys for Plaintiff

*Additional Attorneys on Signature Page*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| CHARLOTTE WOOD, on behalf of herself and all others similarly situated,<br><br>                 Plaintiff,<br>   v.<br><br>IMH SECURED LOAN FUND, LLC; IMH FINANCIAL CORPORATION; INVESTORS MORTGAGE HOLDINGS INC.; IMH HOLDINGS, LLC; IMH MANAGEMENT SERVICES, LLC; SHANE ALBERS; WILLIAM MERIS; STEVEN DARAK,<br><br>           Defendants. | No. 2:10-cv-01213-ROS<br><br>**Plaintiff's Memorandum of Points and Authorities in Support of Her Motion for a Temporary Restraining Order, Expedited Discovery, and Entry of a Schedule for a Preliminary Injunction Hearing** |

Plaintiff Charlotte Wood submits this Memorandum of Points and Authorities in support of her motion for:  (1) a temporary restraining order; (2) expedited discovery; and (3) entry of a scheduling order providing a for an expedited discovery schedule, expedited briefing and the scheduling of a preliminary injunction hearing.

## Preliminary Statement

Plaintiff is a member of the proposed class of all unitholders ("Unitholders") of IMH Secured Loan Fund, LLC (the "Fund") who will be:   (1)   damaged by the conversion transaction (the "Conversion Transaction" or the "Transaction") proposed by the Fund's manager, Investors Mortgage Holdings, Inc. (the "Manager"), its affiliates, including IMH Holdings, LLC ("Holdings"), and the individual defendants Shane Albers ("Albers"), William Meris ("Meris") and Steven Darak ("Darak", together with Albers and Meris, the "Individual Defendants", and together with the Manager and Holdings, the "IMH Defendants") and (2) coerced or misled into voting for the Conversion Transaction pursuant to a coercive and misleading Form S-4 Registration Statement filed with the United States Securities and Exchange Commission on May 10, 2010 (the "Registration Statement"), and declared effective on May 14, 2010.   Plaintiff filed her class action complaint (the "Complaint") on June 7, 2010.   Declaration of Ron Kilgard ("Kilgard Dec."), Ex. A.

Plaintiff now seeks to temporarily enjoin the vote on the self-dealing and unfair Conversion Transaction, which is now due to be completed on June 14, 2010, until she can engage in  expedited discovery, expedited briefing and have a hearing for the entry of a preliminary injunction.   By way of the preliminary injunction, Plaintiff will seek to have the Conversion Transaction as it is presently constituted, enjoined, and/or  the current misleading and coercive Registration Statement, pursuant to which the vote on the Conversion Transaction is being solicited, revised and amended. Kilgard Dec., Ex. B.

As  further  explained  below,  the  Conversion  Transaction  is  a  self-dealing

transaction which was crafted in order to further the interests of the IMH Defendants, particularly Individual Defendants Albers and Meris, at the expense of the Unitholders. Among other things, the Conversion Transaction is being pursued in order to entrench Meris and Albers in their current management positions, and enable them to continue to receive significant remuneration and other benefits from such employment.   It also provides that the Manager and Holdings, two virtually insolvent entities wholly owned by Albers and Meris, are to be purchased from them for stock with a value of almost $18 million.  The Registration Statement, which went effective on May 14, 2010, after nine amendments, continues to contain materially false and misleading statements, and omissions of material fact, including a fairness opinion regarding the consideration to be paid for the Manager and Holdings which is based upon pure speculation and hypothetical projections.

The Conversion Transaction has been the subject of intense opposition by Unitholders, including a group composed of two Unitholders and several real estate professionals who call themselves "The Committee to Protect IMH Secured Loan Fund" (the "Committee")[1], and an individual Unitholder named David Kurtz ("Kurtz").

The IMH Defendants have taken extreme actions to crush the dissension of these Unitholders and any others to their Conversion scheme.  In response to the Committee's filings, the IMH Defendants have disseminated additional misleading statements, including a letter dated May 28, 2010 (the "May 28th Letter").   Kilgard Dec., Ex. C.

---

[1]  The Committee has recently filed a Schedule 14A  Proxy Statement, seeking to remove the Manager and replace it with the Committee members. Kilgard Dec., Ex. B.

The IMH Defendants' response to Kurtz has been even more extreme— a suit in which these purported fiduciaries are suing every Unitholder in the Fund.  That action, *IMH Secured Loan Fund, LLC v. Kurtz,* No. 2:10-CV-01071 (ROS) (the "*Kurtz Action*"), names as defendants a class consisting of every Unitholder in the Fund, alleging that, "[t]he approximate size of the Defendant Class is 4,735, and is comprised of individuals, corporations, partnerships, joint ventures or other legal entities who are Fund members." Kilgard Dec., Ex. D.

Through the *Kurtz Action*, which itself is a misuse of the Fund's corporate machinery, the Fund purportedly seeks a declaratory judgment as to whether the Registration Statement is false and misleading, and whether in advancing the Conversion Transaction or "Reposition Plan", the Manager has acted consistently with its fiduciary duties. However, by suing every Unitholder, the IMH Defendants are clearly using the *Kurtz Action* as a means to thwart any opposition to the Conversion Transaction and thus to force or coerce a vote on the Transaction through a materially misleading Registration Statement.  Moreover, by filing the *Kurtz Action*, the Individual Defendants have squarely placed the issues regarding the fairness of the Conversion Transaction and the veracity of the Registration Statement before this Court, effectively admitting that those issues must be decided before a vote approving the Conversion Transaction can be consummated.

Given these facts, it is evident that the Plaintiff and the Class will suffer irreparable harm if a temporary restraining order, expedited discovery and a preliminary injunction hearing are not issued or scheduled by the Court.   At this point, a fully

informed, uncoerced vote on the Transaction cannot be held, as further explained below. Under such circumstances, it is black letter law that the vote must be restrained until a correct and accurate solicitation document is disseminated. [2] *See, e.g., ODS Technologies, L.P. v. Marshall*, 832 A.2d 1254 (Del Ch. 2003).  This is even more true here, where the Defendants are misusing the Fund's corporate machinery to coerce Unitholders into voting for the self-dealing Transaction by suing them and quashing any legitimate opposition to the Transaction.   Should that occur, and the Transaction consummated as a result, the Unitholders suffer further irreparable harm. As often held by the Delaware Chancery Court, once an unfair extraordinary transaction occurs, it cannot be undone,  constituting irreparable harm**.** *See, e.g*., *Shell Joseph v. Shell Oil Co.,* 482 A.2d 335, 344 (Del. Ch. 1984).

Defendants, however, will not suffer any prejudice by issuance of the relief sought here.  As they admit in the *Kurtz Action*, they can extend the date of the vote if necessary, in order to accommodate proceedings regarding the veracity of the Registration Statement and whether the Conversion Transaction is a breach of fiduciary duty.  See Kilgard Dec., Ex. D at ¶ 35.

As such, Plaintiffs respectfully request that the Court:   (1) enter a temporary restraining order keeping the *status quo* and the vote from closing until expedited

---

[2] Delaware law is applicable here as the Fund is incorporated in Delaware. *Sternberg v. O'Neil,* 550 A.2d 1105, 1123 (Del. 1988) ("Delaware's well established conflict of laws principles require that the laws of the jurisdiction of incorporation govern internal corporate relationships").

proceedings can be had seeking the injunction of the Conversion Transaction and/or the revision of the Registration Statement, and (2) entering the proposed scheduling order for expedited proceedings including a preliminary injunction hearing.  Kilgard Dec., Ex. E.

### Facts

The facts giving rise to this action are fully set forth in the accompanying Complaint.  The below is a brief iteration of the facts most relevant to this application.

***The Fund.***   The Fund was commenced and started operating in 2003 for the exclusive purpose of originating, acquiring, and managing commercial real estate loan investments consisting primarily of short-term commercial mortgage loans in the $10 million to $15 million range, collateralized by first mortgages on real property.  Kilgard Dec., Ex. A at ¶ 36.   It was started by Albers and Meris, who ran the Fund through their virtually wholly owned subsidiaries, the Manager, which managed the Fund, and Holdings, an entity which is wholly owned by the Manager, and which  itself owns IMH Management Services, LLC,  the entity which provides services to the Manager.  *Id.* at ¶¶ 38, 47-49.   The Manager's income, and thus the income of Meris and Albers, was dependent upon the Fund being able to originate and service loans.  *Id.* at ¶¶ 93-94.

***The Fund's Poor Performance.***   By April 2009, the Fund was forced to take a major write down of its assets when it finally marked to market the value of its portfolio—sustaining a net loss of $258.3 million.  *Id.* at ¶¶ 85-89.  The sudden write off at the end of 2008 resulting in a net loss of over $258 million was caused in significant part by the Manager's and the Individual Defendants' mismanagement.  *Id.* at ¶ 89.  Fifty

of the Fund's 55 mortgages, moreover, were in foreclosure, with a principal amount of $532 million in default. *Id.*

    ***The Conversion Transaction.*** Unable to originate new loans, and with most of the Fund's loans going into default, the Manager and Holdings, the primary source of Albers's and Meris' incomes, began to decline significantly.[3] *Id.* at ¶ 98. Eventually the Manager and Holdings were close to insolvency. *Id.* at ¶ 22f.

    Faced with the loss of their remuneration, Albers and Meris had to devise a plan through which they would be able to maintain their positions, while changing the fee structure of the Fund in order to ensure that they would earn fees even if the real estate decline continued. The Conversion Transaction became just such a device.

    On February 11, 2010, the Manager, Holdings and the Individual Defendants, entered into the Agreement and Plan of Conversion and Contribution, by and among IMH Secured Loan Fund, LLC, IMH Financial Corporation, Investors Mortgage Holdings, Inc., and its Stockholders, IMH Holdings, LLC and its Members, (the "Conversion Agreement"), which contemplates a multistep transaction resulting in the internalization of the Manager and its affiliates and the conversion of the Fund into a publicly traded holding company, to be called IMH Financial Corporation ("IMH" or the "Company"). (This was subsequently replaced by a May 5, 2010, Conversion Plan Agreement (the "Conversion Plan")). *Id.* at ¶ 2.

---

[3] During this period, Albers and Meris further established a competing fund called SWIM, in direct conflict with the Fund. *Id.* at ¶ 114.

If the Conversion Plan is consummated, the Fund will be converted into a Delaware corporation, with Unitholders receiving 220.3419 of either non-transferable shares of IMH Class B or IMH Class C shares, or a combination thereof, for each unit. *Id.* at ¶ 3. The Conversion Agreement contemplates that the Class B shares will eventually be converted to IMH shares, albeit subject to lengthy transfer restrictions, which are to be listed on the New York Stock Exchange ("NYSE"), while the Class C shares are to be redeemed at the Manager's discretion, with proceeds of a public offering, assuming that IMH can go public. *Id.*

The terms of the Conversion Transaction were not negotiated by way of an arm's length process, but rather were devised entirely by Albers and Meris, among others, to benefit and entrench themselves. *Id.* at ¶ 4. Under the Conversion Agreement: (1) IMH is required to purchase the equity of the Manager and Holdings, which are wholly owned by the Albers and Meris, for approximately $18 million in IMH stock (depending upon the Manager's and Holding's net losses as per the Conversion Plan), despite the fact that these entities have virtually no income and will sustain a significant loss in the first quarter of 2010; (2) the stock to be received by Albers and Meris can be sold, under certain circumstances, almost immediately upon an IMH listing on the NYSE, and potentially ahead of the stock to be received by Unitholders, as further discussed below; (3) the Manager's over $7 million in current expenses, and its future expense will be borne by IMH (4) while Albers and Meris become executives and directors of the IMH, and receive lucrative, although yet to be negotiated, employment agreements, stock incentives and other remuneration; (5) Albers and Meris and other executives of the

8

Manager and Holdings will also own over 10% of IMH, although they have very few units to be converted to IMH shares, and (6) Albers and Meris will also receive six-year indemnification agreements, a crucial benefit given their admitted mismanagement of the Fund. *Id.* at ¶ 5.

Moreover, Albers and Meris have indicated that if the Conversion Transaction does not occur, they may resign if their fee structure is not changed so that they earn an asset management fee of 1.5% to 2.0% of the cost basis of the Fund's total assets under management, and a carried interest fee of 20% of net earnings over a hurdle rate to be specified. *Id.* at ¶ 135-36.

***The Conversion Transaction Does Not Benefit the Unitholders.***   While the benefits of the Conversion Transaction to Albers and Meris are apparent, the Unitholders will obtain few, if any, benefits.  First, it is in the discretion of the Manager as to when and if IMH will be publicly listed. Second, even if it is listed, the Class B shares received by Unitholders which will be convertible to restricted IMH shares, will be subject to a lock up and not transferable for a period of anywhere from six months to a year.  Third, Class C shares will be redeemed at the Manager's discretion, at a price to be determined by the Manager, with some portion of the proceeds of a subsequent public offering.  The price is guaranteed to be less than the Unitholders' initial investment.  Fourth, the Unitholders will be forced to take a reduction in their tax basis, and, thus, will lose any tax benefits which have accrued to them as a consequence of the Fund's losses, and fifth, they will also lose the right to be cashed out as provided for in that section of the

Operating Agreement which refers to roll-up transactions, as further discussed below. *Id.* at ¶ 6.

The Transaction will further eliminate the standing of the Unitholders to bring mismanagement claims against the Manager and Holdings which they now have as a consequence of the Manager's admitted failure to perform appropriate due diligence on the Fund's current real estate portfolio, and maintain proper internal accounting controls. *Id.* at ¶ 12.

Moreover, the Conversion Transaction fails to provide Unitholders with a potentially significant right—the right to be cashed out at an appraised price. The IMH Defendants have maintained that the Conversion Transaction is not a "roll up" under the terms of the Operating Agreement. *Id.* at ¶ 13.

***The Conversion Transaction Is Unfair.*** The Defendants have breached and, unless enjoined, will continue to breach their fiduciary duties both to the Unitholders and the Fund. The Transaction is neither fair from a process nor substantive point of view, and is a violation of the Manager's, Holding's, and Individual Defendants' fiduciary obligations both under common law and the Operating Agreement.

Among other things, the Transaction is procedurally unfair as: (a) despite the Manager's conflict of interests, no independent entity or person, whether an attorney or investment advisor, represented the Unitholders' interests; (b) as such, no one has opined whether the Transaction, including the merger ratio of 220.3419 of Class B or Class C shares for every unit (the "Merger Ratio"), the transfer restrictions or lock up provisions, and the change in the tax basis of their units to which Unitholders shares will

be subject are fair to the Unitholders; no one has considered the value of the Unitholders' or the Fund's claims against the Manager and Holdings; (c) the Manager terminated the first investment advisor which it retained to opine upon the fairness of the price being paid for the Manager's and Holding's equity from a financial point of view to the IMH shareholders (who do not yet exist); and (d) the price of approximately $18 million (less net losses as per the Conversion Plan) in IMH shares being paid for the Manager and Holdings is unfair as these entities are presently close to insolvent. *Id.* at ¶ 21.

***The Registration Statement Is Materially Misleading.*** The Registration Statement is coercive, false and misleading in the following respects, among others: (a) It threatens the Unitholders that if the Conversion Transaction and a new method for determining its fees (based upon an up front payment rather than based upon the assets of the Fund) are not approved, the Manager may resign; (b) it does not contain an opinion indicating that the terms of the Transaction are fair to the Unitholders or the Fund; (c) it contains a substitute opinion by Sutter Securities Incorporated ("Sutter") that the consideration to be received by the Manager and Holdings is fair to IMH shareholders, an irrelevant constituency as IMH does not even now exist; (d) it does not provide any potential value of IMH shares should the Company list, nor does it provide any time line in which the Company is intended to be taken public; (e) it misleadingly states that the purpose of the Conversion is to provide Unitholders with liquidity, but imposes onerous transfer restrictions on the Unitholders' sales and leaves in the discretion of IMH's board, on which the Albers and Meris will sit, the option of taking the IMH public, and

therefore, is likely to leave the Unitholders in a completely illiquid situation; (f) the fairness opinion provided by Sutter (the "Fairness Opinion"): (1)   calculates the Manager's value, in significant part, based upon IMH going public rather than the Manager's current value as a virtually insolvent entity;  (3) uses a "comparables company analysis" that is not comparable to the current situation and the comparable transactions do not reflect current market conditions, nor mismanagement by the outside manager who is being internalized, as occurred here; (4) fails to take into account the fact that the Manager's two primary sources of fee income were the origination of loans, which have ceased, and the value of the Fund's portfolio, which has declined, thus giving the Manager no income, much less a worth of $18 million; and (5) does not opine that the Transaction or even the consideration to be paid to the Manager and Holdings is fair to the current Unitholders.[4]

## Argument

### A.   The Court Should Issue a TRO  to Maintain the Status Quo

Federal Rule of Civil Procedure 65(b) provides that a court may issue a temporary restraining order.  In this case, Plaintiff requests that the Court issue a TRO given that the vote on the Conversion Transaction is scheduled to close on June 14, 2010.  This is insufficient time for Plaintiff to engage in expedited discovery and for the Court to hold a preliminary injunction hearing to enjoin the vote on the Transaction because it is being held pursuant to a misleading Registration Statement.

---

[4] The IMH Defendants made additional false and misleading statements in the March 28th Letter.  Kilgard Dec., Ex. C.

B.   <u>The Court Should Provide for Expedited Discovery</u>

Plaintiff further requests that once a TRO is issued, she be granted limited expedited discovery in order to prepare for a preliminary injunction.

Federal Rule of Civil Procedure 26(d) provides in relevant part that: "Except when authorized under these rules or by order or agreement of the parties, a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f). The requirement for a Rule 26(f) conference may be overridden by a court order. *Wilkins v. Maricopa County*, 2010 U.S. Dist. LEXIS 12622 (D. Ariz. Jan. 25, 2010).

As this Court found in *Yokohama Tire Corp. v. Dealers Tire Supply, Inc.*, 202 F.R.D. 612 (D. Ariz. 2001), one of the circumstances in which expedited discovery should be granted is when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings. *Id.* at 613. In such cases, an order may be issue upon a showing of good cause. *Wilkins*, 2010 U.S. Dist. LEXIS at *2; *Yokohama Tire*, 202 F.R.D. at 614. Good cause exists "where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273 (N.D. Cal. 2002). In fact, expedited discovery is routinely granted in actions such as the present one, which involve a potentially misleading vote for an unfair transaction. *In re Int'l Jensen Inc. S'holders Litig.*, 1996 Del. Ch. LEXIS 77, at *1-2 (Del. Ch. July 16, 1996).

C.   <u>Plaintiff Can Establish a Need for Expedited Discovery</u>

The need for expedited discovery here is apparent, and will clearly further the administration of justice. The misleading Registration Statement only went effective on

May 14th and gives Unitholders only until June 14th to vote for the Conversion Transaction.   At the same time, Unitholders are being bombarded with conflicting statements from both the Committee and the IMH Defendants regarding the need for the Conversion Transaction, with some statements sent as recently as June 7th.   The IMH Defendants have provided the over 4,700 Unitholders with only 30 days in which to read and digest the over 500 page Registration Statement, and now are confronting them with additional, misleading material.   The IMH Defendants themselves have admitted in these repeated filings, that the Unitholders must be confused by all the correspondence. Kilgard Dec., Ex. F (June 4, 2010 Letter) ("You may be confused by all the correspondence coming from IMH as well as an outside group, LGM Capital.")

Without a TRO, and expedited discovery, which Plaintiffs believe will demonstrate that the Registration Statement and certain of these subsequent letters contain materially false statements, the Unitholders will be misled into approving a completely self-dealing Transaction, which may not be in their best interests.

D.     Defendants Will Not Suffer Any Prejudice

On the other hand, Defendants, particularly the IMH Defendants, cannot claim that they will suffer any prejudice by a TRO and expedited discovery. It has taken them over six months to finalize the Registration Statement.   They cannot claim now that there is any rush to complete this Transaction.   Moreover, the Transaction contemplates that IMH be listed on the New York Stock Exchange and that it hold an initial public offering. Given the financial markets as of this writing, a delay in consummating the vote and the deal will likely be beneficial, rather than prejudicial.

14

Further, the IMH Defendants have recently filed the *Kurtz Action*, asking for a declaratory judgment on issue of whether the Conversion Transaction is a breach of the Manager's fiduciary duties, and whether the Registration Statement is false and misleading.  The docket sheet for that action demonstrates that the Fund has done little to move that case since its filing, demonstrating that the IMH Defendants, who are behind that case, are apparently in no rush to obtain that declaratory judgment.  Even more to the point, the "Plaintiff" in that action admits that the vote can be adjourned if necessary – clearly demonstrating that the IMH Defendants themselves do not believe that they will suffer any prejudice if the vote is extended.

### E.   Discovery Would be Limited

If granted the right to proceed with expedited discovery, Plaintiff intends to propound the attached document demand, and then take three to four examinations, including that of Albers, Meris, and Sutter Financial. Kilgard Dec., Ex. G.  The examinations will involve issues necessary to demonstrate that the Conversion Transaction is a breach of the IMH Defendants' fiduciary obligations to the Fund and its Unitholders.   The discovery to be taken here is equally necessary in the *Kurtz Action*.

### F.   Plaintiffs Will Suffer Irreparable Harm if Expedited Discovery Is Not Granted

Plaintiff and the Class will suffer irreparable harm if a temporary restraining order is not entered and expedited discovery and injunction hearing are not scheduled. Therefore, it is consistent with the administration of justice that expedited discovery be granted and that the expedited discovery, briefing and hearing schedule be entered.

At this point, a fully informed, non-coercive vote on the Transaction cannot be held, and the Unitholders would suffer irreparable damage if they are made to vote under these circumstances.   This is the paradigm of an action in which expedited discovery should be issued in anticipation of a preliminary injunction.   *See, e.g., In re Topps Co. S'holders Litig.,* 926 A.2d 58, 84 (Del. Ch. 2007) (enjoining stockholder vote on the basis of omissions and materially misleading disclosures); *Gilmartin v. Adobe Resources Corp.,* 1992 WL 71510 (Del. Ch.); *Eisenberg v. Chicago Milwaukee Corp.,* 537 A.2d 1051, 1062 (Del. Ch. 1987).

Dated:  June 8, 2010.

KELLER ROHRBACK, P.L.C.

By:  _/s/ Ron Kilgard_____
Ron Kilgard
3101 North Central Avenue, Suite 1400
Phoenix, Arizona 85012-2643
Phone: 602-230-6324
Fax: 602-248-2822

THE GRANT LAW FIRM, PLLC
Lynda J. Grant
Seven East 35th Street, 12th Floor
New York, NY 10016
Phone: 917-697-8108
Fax: 917-256-1949
(Admission *Pro Hac Vice* Pending)

LASKY & RIFKIND, LTD.
Leigh Lasky
Norman Rifkind
350 N. LaSalle Street
Suite 1320
Chicago, IL  60610
Phone: 312-634-0057
Fax: 312-634-0059
(Admission *Pro Hac Vice* Pending)

Attorneys for Plaintiff